Martin A. LEHMAN, Plaintiff,

v.

DISCOVERY COMMUNICATIONS, INC., Defendant.

No. 01 CV 4211 ADS WDW.

United States District Court, E.D. New York.

Sept. 1, 2004.

Martin A. Lehman, West Hempstead, NY, Pro Se, Plaintiff.

Ohrenstein & Brown, LLP by Steven Rosenfeld, Esq., New York City, for Defendant.

SPATT, District Judge.

Presently before the Court is a motion by the defendant Discovery Communications, Inc. ("DCI" or the "defendant") for summary judgment dismissing the complaint in its entirety. For the reasons set forth below, the defendant's motion is denied.

## I. BACKGROUND

The following facts are undisputed unless otherwise indicated. On May 21, 1997, Dr. Martin A. Lehman ("Dr. Lehman" or the "plaintiff"), an orthopaedic surgeon who is now retired, was arrested and charged with insurance fraud. His arrest was in connection with a two year undercover sting operation, "Operation Backbone." This investigation was conducted to address growing incidences of insurance fraud by medical providers and legal representatives in the area of automobile no-fault, disability and workers' compensation claims. The operation was conducted jointly by the Special Investigations Bureau of the Office of the District Attorney, the Nassau County Police Department, and the United States Postal Inspection Services. Multiple insurance industries entities also participated in Operation Backbone. This operation led to the arrests of 20 individuals, including the plaintiff.

The sting operation was reported extensively by the media, including local television stations, numerous local and national newspapers, and the ABC News Series *20/20*. The Office of the District Attorney of Nassau County held a press conference following the arrests and discussed Operation Backbone in detail. In addition, the District Attorney's Office issued and posted on its website detailed press releases about the arrests made in connection with the sting operation. The District Attorney's Office prosecuted the plaintiff, and on March 3, 1999, following a jury trial, he was acquitted of all charges.

On March 21, 1999, DCI first aired a television program entitled "World's Most Outstanding Undercover Stings" on The Learning Channel. The program included a segment reporting on Operation Backbone. The complaint describes that Assistant District Attorney Barbara Kornblau

appeared on the program and described "Operation Backbone." In particular, Kornblau explained that she was one of the supervisors of the operation, which targeted professionals who had allegedly provided false information to insurance companies or had submitted false insurance claims. Kornblau also said that personnel involved in Operation Backbone videotaped doctors performing examinations of patients, and the prosecutors used the videotapes extensively during their grand jury presentations. In the televised interview, Kornblau opined that the videotapes led many defendants to enter guilty pleas.

At one point during the television program, several clips of the videotapes were shown while Kornblau or a narrator spoke in the background. In one clip, the plaintiff is shown examining a patient during a follow-up visit. According to the plaintiff, the clip from the videotape also shows him taking x-rays of the patient, performing range-of-motion tests, and discussing a diagnosis and treatment plan with the patient. While this clip is shown, the narrator states, " 'Twelve undercover agents found corruption on every level from doctors willing to spend only seconds examining a phoney patient.' "

Further, the plaintiff appears in another videotape clip, and the narrator states, "With enough evidence in their possession, twenty professionals involved in billing more than two million dollars in false claims are brought to justice." The third clip consists of pictures of three health care providers. Two of the people displayed had been convicted of insurance fraud, while the third person was the plaintiff who had been acquitted of such charges. While these three pictures were shown, the following comments were made: "Operation Backbone is a success but the fight to eliminate false insurance claims continues. For anyone tempted to try this get rich quickly scheme, listen to Ted Kerner, 'Be careful when you consider faking an insurance claim. In the modern era, we are going to find out, and a felony conviction as an adult changes the expectation of the rest of your adult life.' "

Without any changes in its content, the program was aired on The Learning Channel on 17 occasions from March 21, 1999 until May 24, 2001.

On June 21, 2001, Dr. Lehman commenced this action, alleging that, on May 24, 2001, the defendant aired the program on The Learning Channel. The plaintiff alleges that several quotations from the program constitute libel and slander *per se* and seeks both compensatory and punitive damages in connection with only the May 24, 2001 airing of the program.

## II. DISCUSSION

### A. Standard of Review

A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

When deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers,

and depositions in favor of that party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). In the case of a *pro se* party, the court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, *pro se* status " 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (quoting *Birl v. Estelle,* 660 F.2d 592, 593 (5th Cir.1981)).

## B. Statute of Limitations

■ The defendant first argues that the complaint is barred by the statute of limitations for defamation. The statute of limitations for defamation in New York is one year. N.Y. C.P.L.R. § 215(3). In determining when the statute of limitations begins to run on a defamation claim, New York applies the single publication rule. *Gregoire v. G.P. Putnam's Sons,* 298 N.Y. 119, 125, 81 N.E.2d 45 (1948). Under this rule, any edition of a book or article, regardless of the number of copies sold, is considered a "single publication" which gives rise to only one cause of action. *Van Buskirk v. The New York Times Co.,* 325 F.3d 87, 89 (2d Cir.2003) (citing *Gregoire,* 298 N.Y. at 126, 81 N.E.2d 45). In New York, the statute of limitations for libel is one year, *see* N.Y. C.P.L.R. § 215(3), and begins to accrue at the time of the first publication, which is defined as "the earliest date on which the work was placed on sale or became generally available to the public." *Van Buskirk,* 325 F.3d at 89 (internal quotations and citation omitted).

The purpose of the single publication rule is "to prevent a multiplicity of actions,

leading to potential harassment and excessive liability, and draining of judicial resources." *Firth v. State of New York,* 98 N.Y.2d 365, 369–70, 747 N.Y.S.2d 69, 775 N.E.2d 463 (2002) (citations omitted). The rule further "reduces the possibility of hardship to plaintiffs by allowing the collection of all damages in one case commenced in a single jurisdiction." *Id.* at 371, 747 N.Y.S.2d 69, 775 N.E.2d 463. Courts have adopted the rule to books and newspapers and have extended it to Internet publishing. *See id.* ("no rational basis upon which to distinguish publication of a book or report through traditional printed media and publication through electronic means by making a copy of the text of a Report available via the Internet.").

■ According to the defendant, the single publication rule should be applied to a rebroadcast of defamatory material on television. In support of its argument, DCI points out that, in relation to television programming in the context of privacy claims, New York courts have applied the rule and have not treated each individual broadcast as a republication. In particular, the defendant cites to *Zoll v. Jordache Enterprises, Inc.,* No. 01 CV 1339, 2002 WL 31873461, *11, 2002 U.S. Dist. LEXIS 24570, at * 34 (S.D.N.Y. Dec. 20, 2002), in which a court held that the statute of limitations for a right of privacy claim begins to run the first time the commercial is aired. In *Zoll,* the plaintiff modeled the defendant's jeans in a video shoot in 1978. *Id.* at 2002 WL 31873461, *1, 2002 U.S. Dist. LEXIS 24570, *3. The footage was used in a series of jeans commercials in 1978 and 1979 and was then later incorporated in a new commercial and aired, without any change, in the year 2000 to publicize a new line of vintage jeans. *Id.* at 2002 WL 31873461, *3–4, 2002 U.S. Dist. LEXIS 24570, *7–11.

Applying the single publication rule, the court granted the defendant's motion for summary judgment in its favor on the plaintiff's right of publicity claims, holding that the claims were time-barred because the re-airing of the 1978 commercial as the 2000 re-release was not a republication. *Id.* at 2002 WL 31873461, *11, 2002 U.S. Dist. LEXIS 24570, *34. Relying on the holding from *Nelson v. Working Class, Inc.*, No. 99 CV 8854, 2000 WL 420554, 2000 U.S. Dist. LEXIS 4848 (S.D.N.Y. Apr. 5, 2000), which applied the single publication rule to the airing of commercials in the context of a right of privacy claim, the court held that the statute of limitations was not retriggered with each subsequent airing of the commercial. *Id.* at 2002 WL 31873461, *9–10, 2002 U.S. Dist. LEXIS 24570, *30–31. The court noted that, although the Restatement (Second) § 577A(3) states that the rebroadcast of defamatory material over radio or television reaches a new audience and justifies a new cause of action, the court stated that "New York's application of the single publication rule to right of privacy actions does appear to diverge from the approach set out in the Restatement, which discusses the application of the single publication rule in defamation cases." *Id.* at 2002 WL 31873461, *9, 2002 U.S. Dist. LEXIS 24570, *30.

The *Zoll* court considered the issue again in connection with a motion for reconsideration. *Zoll v. Jordache Enter., Inc.*, No. 01 CV 1339, 2003 WL 1964054, 2003 U.S. Dist. LEXIS 6991 (S.D.N.Y. April 22, 2003). In particular, the court examined whether the 2000 re-release was a republication because it was used to sell a new, updated product and the defendant made a "very conscious decision" to re-release the 1978 commercial for marketing purposes. *Id.* at 2003 WL 1964054 at *2, 2003 U.S. Dist. LEXIS 6991 at *6. The court noted that whether a publication is

designed to reach a new audience is merely a factor in determining whether there has been a republication. *Id.* at 2003 WL 1964054, *2, 2003 U.S. Dist. LEXIS 6991, *7. The court rejected this factor and explained that there must be something more, such as modification to the original publication, for there to be republication. *Id.* at 2003 WL 1964054, *2, 2003 U.S. Dist. LEXIS 6991, *8.

The defendant urges this Court to apply the single publication rule for a rebroadcast of a television program with regard to a defamation claim. According to the defendant, based upon the holdings from *Zoll* and *Nelson*, the subsequent re-airing of a television program, in a format identical to the original broadcast, does not constitute a republication in the defamation context. As such, the defendant argues that the statute of limitations began to run from the first broadcast on March 21, 1999. As a result, the defendant argues that, because the plaintiff did not commence this action until June 21, 2001, his complaint is untimely. The Court disagrees.

■ The Court notes that the holdings in *Zoll* and *Nelson* were in the context of privacy claims. The Second Restatement of Torts specifically provides that "each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." Restatement (Second) of Torts § 577A subs (1) comt. While the single publication rule recognizes that one printing of an edition of a book, magazine, or newspaper is one communication, an exception to this rule exists where the defendant subsequently republishes or reissues the statement. *Firth*, 98 N.Y.2d at 371, 747 N.Y.S.2d 69, 775 N.E.2d 463. Thus, courts have recognized that "repetition of a defamatory

statement in a later edition of a book, magazine or newspaper may give rise to a new cause of action." *Id.; see, e.g., Rinaldi v. Viking Penguin, Inc.*, 101 Misc.2d 928, 422 N.Y.S.2d 552, 556 (1979), aff'd as modified, 73 A.D.2d 43, 425 N.Y.S.2d 101 (1st Dep't 1980) (issuance of a paperback edition which contained defamatory statements was a separate and distinct publication); *Karaduman v. Newsday, Inc.*, 71 A.D.2d 411, 422 N.Y.S.2d 426 (1st Dep't 1979) (article which first appeared in a newspaper and then rewrote in a book constituted a republication); *Cook v. Conners*, 215 N.Y. 175, 179, 109 N.E. 78 (4th Dep't 1915) (article first published in a morning edition and then published in an afternoon edition by the same newspaper constituted a republication).

Section 577A(3) (comment d) of the Restatement (Second) of Torts explicitly recognizes that a rebroadcast of defamatory material via television constitutes a separate publication:

> **Rebroadcast of the defamation over radio or television or a second run of a motion picture on the same evening ... [is a separate publication] that reaches a new group and the repetition justifies a new cause of action. The justification for this conclusion usually offered is that in these cases the second publication is intended to and does reach a new group.**

Like a publication of the same defamatory statement in both a morning and evening editions of a newspaper, a rebroadcast of a television show is intended to reach a new audience and is therefore an additional communication. A rebroadcast has renewed impact with each viewing and creates a new opportunity for injury, thereby justifying a new cause of action.

If a court determines that a broadcast contains defamatory statements, the offender cannot rebroadcast such statement.

To avoid liability, the decision maker need only make a conscious decision to refrain from rebroadcast. If the decision maker has sustained her maximum liability when she first broadcasts the television program, she has no motivation to limit the injury. Thus, the Court finds that the rebroadcast of the television program constitutes a republication and therefore provides for a new cause of action and refreshes the statute of limitations. The plaintiff here commenced this action on June 21, 2001 for the broadcast of the May 24, 2001 program on The Learning Channel. As such, the complaint is not barred by the statute of limitation.

## C. The Defendant's Liability

The defendant next argues that it is entitled to summary judgment dismissing the plaintiff's defamation claim because its actions were not "grossly irresponsible" in reporting on a matter of legitimate public concern. In addition, the defendant contends that the plaintiff's punitive damages claims must be dismissed because he cannot establish any evidence that the defendant acted with actual malice.

The defendant contends, and the plaintiff appears to concede, that the program on insurance fraud was one of legitimate public concern and that Dr. Lehman may not recover unless DCI acted in a "grossly irresponsible manner." To determine whether a publisher acted in a grossly irresponsible manner, a court considers whether it "(1) followed sound journalistic practices in preparing the allegedly defamatory article; (2) followed normal procedures, including editorial review of the copy; (3) had any reason to doubt the accuracy of the source relied upon and thus a duty to make further inquiry to verify the information; and (4) could easily verify the truth." *Chaiken v. VV Publish-*

*ing Corp.,* 119 F.3d 1018, 1032 (2d Cir. 1997) (internal quotations and citations omitted); *see also Weber v. Multimedia Entertainment, Inc.,* No. 97 CV 0682, 2000 U.S. Dist. LEXIS 5688, at *22 (S.D.N.Y. Apr. 29, 2000) (quoting *Hawks v. Record Printing and Pub. Co.,* 109 A.D.2d 972, 486 N.Y.S.2d 463, 466 (3d Dep't 1985)).

In this case, DCI has not met its initial burden of demonstrating the absence of a genuine issue of material fact with regard to the issue of whether it acted grossly irresponsible. While the defendant has established that the program was within the sphere of legitimate public concern, it has not provided any affidavits explaining the standard procedure for DCI in broadcasting a program or stating that its methods are standard practice in its industry.

The plaintiff asserts that DCI did not verify the truth in its broadcast; verify the allegedly defamatory material by checking the public record; request the Nassau County District Attorney's office for documentary proof; or contact the plaintiff to determine whether the content of the program was true. However, because the defendant's papers are completely silent as to the practices surrounding the broadcast of its television program, the Court is unable to determine whether the defendant acted in a "grossly irresponsible" manner. For similar reasons, the Court is unable to determine whether the defendant acted with actual malice. Accordingly, given the defendant's failure to meet its initial burden of establishing the absence of any genuine issue of material fact with regard to these issues, the defendant's motion for summary judgment must be denied.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the defendant's motion for summary judgment for an order dismissing the complaint in its entirety is **DENIED**; and it is further

**ORDERED**, that the parties are directed to appear for jury selection on October 25, 2004, at 9:00 a.m., at the Long Island Federal Courthouse, 1024 Federal Plaza, Central Islip, New York 11722, in Room 1020.

**SO ORDERED.**