**2021 IL 126024**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

———————————

(Docket No. 126024)

PAUL J. CIOLINO, Appellee, v. ALSTORY SIMON *et al.*
(Terry A. Ekl, Appellant).

*Opinion filed March 18, 2021.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Theis, Neville, Overstreet, and Carter concurred in the judgment and opinion.

Chief Justice Anne M. Burke and Justice Michael J. Burke took no part in the decision.

**OPINION**

¶ 1       Plaintiff, Paul J. Ciolino, filed suit against several defendants, including Terry A. Ekl, for defamation, false light invasion of privacy, intentional infliction of emotional distress (IIED), and civil conspiracy. Pursuant to section 2-619 of the

Code of Civil Procedure (735 ILCS 5/2-619 (West 2016)), the circuit court of Cook County dismissed the claims as barred by the statute of limitations. Except as against one defendant, the appellate court reversed the trial court's determination that the claims were time-barred. See 2020 IL App (1st) 190181, ¶ 3. We allowed Ekl's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019).

¶ 2                                    BACKGROUND

¶ 3        The facts underlying this case are quite extensive. See, *e.g.*, 2020 IL App (1st) 190181, ¶¶ 4-34. We strive to relate only those facts necessary to an understanding of the issue on appeal, which is whether Ciolino's complaint is barred by the statute of limitations.

¶ 4        Northwestern University's Medill School of Journalism (the Innocence Project) sought to exonerate Anthony Porter for the 1982 murders of Jerry Hillard and Marilyn Green. The Innocence Project suspected that a different individual— Alstory Simon—had committed the murders. Ciolino, a private investigator who did work with the Innocence Project, obtained a videotaped confession from Simon.

¶ 5        Ultimately, Porter's conviction was vacated. Simon pleaded guilty to the murders and was sentenced to 37 years in prison. Porter's exoneration generated a great deal of publicity and is regarded as the impetus for former Governor George Ryan calling for a moratorium on the death penalty in Illinois.

¶ 6        Some people, however, remained unconvinced that Simon was responsible for the murders. The tactics Ciolino used to obtain Simon's confession came under heavy scrutiny. Among other things, it was alleged that Ciolino promised Simon that he would secure an attorney, Jack Rimland, to represent him in his murder case. Rimland shared office space with Ciolino and is said to have convinced Simon to plead guilty. He did not challenge Simon's confession to Ciolino or present other evidence to the court.

¶ 7        Simon unsuccessfully filed a *pro se* petition for postconviction relief. Thereafter, Ekl and James Sotos began representing Simon and filed a successive postconviction petition asserting actual innocence. New evidence in support of the successive petition provided that two witnesses who had implicated Simon had

recanted their statements. Those witnesses explained that their statements were induced by promises to them made by David Protess of the Innocence Project.

¶ 8 Following an internal investigation into the Innocence Project's journalistic and investigative practices, Anita Alvarez, the Cook County State's Attorney at that time, revisited Simon's case and formally abandoned all charges against him. The circuit court granted the motion and vacated Simon's convictions. By this time, Simon had served 15 years in prison. Simon filed a federal civil rights lawsuit on February 17, 2015, for malicious prosecution against Ciolino, Northwestern University, Protess, and Rimland.

¶ 9 In 2011, defendant William Crawford authored a document, "Chimera," which contended that the Innocence Project had framed Simon. On June 9, 2015, Crawford published a book titled *Justice Perverted: How the Innocence Project of Northwestern University's Medill School of Journalism Sent an Innocent Man to Prison*, which sets forth the theory that Simon was framed by Ciolino and others to secure Porter's release to ultimately end the death penalty in Illinois. It was this book that inspired the documentary at issue—*Murder in the Park* (Transition Studios 2014).

¶ 10 *Murder in the Park* was created by defendants Andrew Hale and Whole Truth Films. Like *Justice Perverted*, *Murder in the Park* propounds the theory that Protess and the Innocence Project undertook an ends-justified-the-means approach to getting the death penalty abolished in Illinois. *Murder in the Park* contains interviews and commentary from defendants Simon, Hale, Ekl, Sotos, Delorto, Crawford, and Alvarez. The claim is advanced that Ciolino engaged in criminal behavior in his efforts to obtain a false confession from Simon.

¶ 11 Ciolino's position, however, is that defendants' goal has been to discredit the Innocence Project and the wrongful conviction movement. On April 27, 2016, Ciolino filed a counterclaim in Simon's federal case. Ciolino countersued Simon and interposed claims against several defendants, including Ekl, for defamation, false light, IIED, and conspiracy. On January 3, 2017, Ciolino's counterclaim was dismissed because the court concluded that the counterclaim was not compulsory and the district court did not have supplemental jurisdiction. *Simon v. Northwestern University*, No. 15-cv-1433, 2017 WL 25173, at *5 (N.D. Ill. Jan. 3, 2017).

¶ 12 On January 2, 2018, Ciolino filed a complaint in the circuit court of Cook County. Count I is for defamation against several defendants, including Ekl, ultimately stemming from *Murder in the Park*'s content and statements. Ciolino attributes three allegedly defamatory statements to Ekl. Count IV is for false light publicity against all defendants based on the allegedly defamatory statements identified in counts I, II, and III, including the three statements attributed to Ekl in count I. Count V is for IIED against all defendants. Finally, count VI is for civil conspiracy. The circuit court granted defendants' motions to dismiss. Ekl filed a motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2016)) asserting that Ciolino's claims were untimely because he did not file suit in federal court before the expiration of the one-year statute of limitations (*id.* § 13-201).

¶ 13 In support of their motions to dismiss, Ekl and Christopher Rech, a manager of Whole Truth Films, attested to the following information. Per Ekl's affidavit, Ekl attended a public showing of *Murder in the Park* in November 2014 in New York City, at the 2014 DOC NYC film festival. The film festival was open to the public. Rech additionally declared that DOC NYC is America's largest documentary film festival; that, prior to its premiere, *Murder in the Park* was advertised and mentioned in several different media outlets; that from March 24-26, 2015, *Murder in the Park* was played to sold-out audiences at the Cleveland International Film Festival after being advertised in a manner similar to that for DOC NYC; and that "[a]t no time did Whole Truth hide the Documentary or its contents from the public" but it was instead "actively advertised *** so people would go see it." Referencing several exhibits in example, Rech's declaration asserted that *Murder in the Park* was advertised, referenced, or mentioned in varying capacities by the following outlets: the Chicago Sun-Times, the Jacksonville Journal-Courier (Illinois), the Chicago Tribune, Fox News, IndieWire, Variety, the Villager, and Twitter. The articles were published between October 30, 2014, and March 24, 2015.

¶ 14 Ciolino attached his own affidavit to his response, attesting that he was not aware of *Murder in the Park*'s existence as it was being shown in New York City or any of the attendant articles and media promoting *Murder in the Park*. He also attested that he was unaware that *Murder in the Park* was shown in Cleveland in March 2015. Furthermore, Ciolino asserted that he did not learn of *Murder in the*

*Park*'s existence until after it was shown in Chicago at the Gene Siskel Film Center in or around July 2015.

¶ 15    The circuit court granted the motions to dismiss, ruling that the claims were time-barred because *Murder in the Park* premiered more than a year before Ciolino filed suit. The court did not address defendants' arguments that Ciolino's claims were not actionable as a matter of law (*id.* § 2-615).

¶ 16    The appellate court affirmed in part, reversed in part, and remanded to the circuit court for further proceedings. 2020 IL App (1st) 190181, ¶ 101. Relevant here, the appellate court reversed the circuit court's ruling that Ciolino's claims against Ekl were time-barred. *Id.* ¶ 100. Although the New York City premiere of *Murder in the Park* took place more than a year before the operative filing date of Ciolino's complaint, the court analyzed whether the discovery rule applied to Ciolino's claims for defamation and false light publicity such that the one-year statute of limitations was tolled until Ciolino knew or should have known of the publication of the allegedly defamatory material in *Murder in the Park*. See *id.* ¶¶ 39, 42, 50-68. Defendants argued that the discovery rule should not even be considered because the film was not hidden and its existence was not inherently unknowable. *Id.* ¶ 61. Nonetheless, the court noted that a "litany of factual issues" remained unresolved and precluded dismissal. *Id.* ¶¶ 61-62, 68. Additionally, the court concluded that defendants failed to present evidence on all points to counteract the inferences that must be drawn in Ciolino's favor. *Id.* ¶ 61. Accordingly, the court remanded the case for further proceedings. *Id.* ¶ 100.

¶ 17    This court allowed Ekl's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019).

¶ 18                                    ANALYSIS

¶ 19    At issue is whether Ciolino's defamation and false light publicity claims are time-barred. Section 13-201 of the Code of Civil Procedure provides that a cause of action for defamation or false light publicity must be filed within one year of the cause of action's accrual. See 735 ILCS 5/13-201 (West 2016) ("Actions for slander, libel or for publication of matter violating the right of privacy, shall be commenced within one year next after the cause of action accrued."); *Tom*

*Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 61 Ill. 2d 129, 131-32 (1975); *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 393 (2008) (referencing the interdependency of defamation and false light claims). The cause of action for defamation accrues on the date that an allegedly defamatory statement is published. *Tom Olesker's*, 61 Ill. 2d at 131-32. "Any act by which defamatory matter is communicated to someone other than the person defamed is a publication." *Missner v. Clifford*, 393 Ill. App. 3d 751, 763 (2009). Also, " '[a]ll persons who cause or participate in the publication of [defamatory] matters are responsible for such publication.' " *Van Horne v. Muller*, 185 Ill. 2d 299, 308 (1998) (quoting 33A Ill. L. & Prac. *Slander and Libel* § 83 (1970)).

¶ 20        A motion to dismiss pursuant to section 2-619(a) of the Code of Civil Procedure "admits the legal sufficiency of the plaintiff's claim, but asserts certain defects or defenses outside the pleading that defeat the claim." *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006). The running of the statute of limitations is one such defense serving to bar a claim from proceeding further. See 735 ILCS 5/2-619(a)(5) (West 2016); *Moore v. People for the Ethical Treatment of Animals, Inc.*, 402 Ill. App. 3d 62, 73 (2010). A dismissal pursuant to section 2-619 presents a question of law subject to *de novo* review. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006).

¶ 21        Here, by virtue of the Illinois savings statute, Ciolino is deemed to have filed his complaint on April 27, 2016. See 735 ILCS 5/13-217 (West 1994);[1] 2020 IL App (1st) 190181, ¶ 39; *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 105 (1996) ("Section 13-217 gave the plaintiff an absolute right to refile the same cause of action in the circuit court after that action was dismissed in the federal district court for lack of diversity jurisdiction."). Ciolino urges application of the discovery rule because, when *Murder in the Park* was first shown in New York City on November 17, 2014—outside the one-year statute of limitations—he did not and could not have known about the allegedly defamatory statements contained therein. See *Rozny v. Marnul*, 43 Ill. 2d 54, 70 (1969) (the discovery rule permits a plaintiff "to sue within the statutory period computed from the time at which he knew or should have known of the existence of the right to sue").

_____

[1]The subsequent version of this statute was held unconstitutional in its entirety in *Best v. Taylor Machine Works*, 179 Ill. 2d 367 (1997).

¶ 22    Ekl asserts that the discovery rule does not apply and thus Ciolino's complaint is untimely. Ekl posits that the discovery rule's application to this circumstance would undermine the legislature's enactment of the Uniform Single Publication Act (single-publication rule). See 740 ILCS 165/1 (West 2016); *Weber v. Cueto*, 253 Ill. App. 3d 509, 522 (1993) (noting that "[t]he Act prohibits more than one cause of action for the same means of publication, no matter how many times that publication is reproduced"); see also *Founding Church of Scientology of Washington, D.C. v. American Medical Ass'n*, 60 Ill. App. 3d 586, 588-89 (1978) (stating "the subsequent distribution of existing copies of an original publication neither creates a fresh cause of action nor tolls the applicable statute of limitations").

¶ 23    Ekl also notes that the legislature did not write a discovery rule into section 13-201 and thus did not intend for its application. Ekl principally relies on this court's decision in *Tom Olesker's*, which, according to Ekl, holds that defamation claims premised on statements in mass-media publications are not subject to the discovery rule because they are readily accessible to the general public. *Tom Olesker's*, 61 Ill. 2d at 137-38. Ekl contends, relying on *Tom Olesker's*, that subsequent case law more clearly articulated that the discovery rule will only apply where the publication was " 'hidden, inherently undiscoverable, or inherently unknowable.' " See *Peal v. Lee*, 403 Ill. App. 3d 197, 207 (2010) (quoting *Blair v. Nevada Landing Partnership*, 369 Ill. App. 3d 318, 326 (2006)). For example, in *Winrod v. Time, Inc.*, the appellate court held that the statute of limitations began to run on the date a magazine was first disseminated to the general public. 334 Ill. App. 59, 60-61, 72 (1948). In *Winrod*, Ekl stresses that the appellate court did not examine whether the plaintiff received a copy of the magazine or was otherwise made aware of the publication of the defamatory material. See *id.*

¶ 24    According to Ekl, the appellate court below should have only considered whether the New York City showing was concealed from the public or inherently undiscoverable or unknowable. Although the showing in November 2014 at the DOC NYC film festival may not have been easily discoverable, Ekl maintains that it was far from being inherently undiscoverable.

¶ 25    Ciolino counters that Ekl seeks "to overrule long-standing precedent that the discovery rule may apply to defamation and false light claims when the defamatory

material has not been made available to a mass sector of the public." Ciolino contends that general issues of material fact exist as to whether he knew or should have known of the defamatory statements in *Murder in the Park* prior to its Chicago screening on July 15, 2015. It is Ciolino's position that his defamation and false light claims accrued when *Murder in the Park* was mass-published on Showtime on February 17, 2016, or, at the earliest, when it was screened in Chicago on July 15, 2015. Ciolino asserts that *Tom Olesker's* distinguished between defamatory material published through mass-media that is generally available to the public and that which is only available to a small subset of people and generally inaccessible to the public. Ciolino disputes certain averments offered by Ekl. Specifically, Ciolino contends that none of the screenings were advertised to a general audience, that the contents were not reported in any media publications, and that, other than the isolated showings, the film was not available to or accessible by the general public until it began airing on Showtime.

¶ 26        Having set forth the parties' respective arguments, we turn to the issue of whether application of the discovery rule would undermine the single-publication rule.

¶ 27                            Single-Publication Rule

¶ 28        Ekl, Ciolino, and the appellate court all appear to assume that the single-publication rule applies. Numerous cases note that application of the discovery rule in the defamation context would undermine the single-publication rule. Thus, it is necessary to begin our analysis by examining that rule.

¶ 29        The foremost Illinois case examining the single-publication rule is *Winrod*. There, the appellate court examined the propriety of the single-publication rule in the context of whether a libel[2] action was barred by the one-year statute of limitations. *Id.* at 60. The plaintiff filed suit on April 13, 1943, in connection with an alleged libel that was printed and published in an issue of *Life* magazine. The defendant moved to strike the complaint because, although the date "April 13, 1942," appeared on the magazine, the magazine had been published at least two days earlier. *Id.* Affidavits attached to the defendant's motion demonstrated that

---

[2]Illinois no longer distinguishes between libel and slander. See *Bryson*, 174 Ill. 2d at 89.

*Life* magazine subscribers received the copy of the April 13, 1942, issue on or prior to April 11, 1942. *Id.* Also, by April 11, 1942, newsstand sale copies of that issue appeared for sale throughout the country. *Id.* The trial court allowed the motion to strike and entered judgment in favor of the defendant. *Id.* at 60-61.

¶ 30    The *Winrod* court observed that, "[h]istorically, each delivery and sale of an article containing defamatory material was considered a publication that, defenses aside, gave rise to a separate cause of action." *Id.* at 61 (citing *Duke of Brunswick v. Harmer* (1849) 117 Eng. Rep. 75; 14 Q.B. 185). However, the court noted that this rule had recently been tempered by the growing recognition that such a rule was outdated. See *id.* (stating "this ancient rule 'is ill-suited to the needs of a culture demanding mass publication' " (quoting *Libel and Slander—Publication—Sale of Replacement Copies Within Statutory Period Held Republication Resulting in New Cause of Action*, 59 Harv. L. Rev. 136, 136 (1945))). This was because the rule espoused in *Harmer* would lead to a multiplicity of suits and render the statute of limitations meaningless. *Id.*

¶ 31    The *Winrod* court surveyed numerous cases and arrived at the conclusion that " 'the decided weight of authority in this country is, where large distributions of published matter are involved, that the cause of action accrues, for the purpose of the statute of limitations, upon the first publication, when the issue goes into circulation generally.' " *Id.* at 64. Further, as to whether "certain miscellaneous copies [that] were circulated to the general public up to and including April 18 and for some time thereafter" could constitute republications to retrigger the statute of limitations, the court dispensed with this assertion by relying on authority holding that, "where any distribution takes place after the original sale, no new cause of action will accrue if the subsequent distribution is reasonably connected, by trade practice relating to the type of printed matter involved, to the original distribution." *Id.* at 65.

¶ 32    Finally, the *Winrod* court favorably cited Seelman on the Law of Libel and Slander's articulation of the test for distinguishing between when a republication of an article has occurred or simply a repetition of the defamatory material. See *id.* at 68-69 (describing the reliance thereon by *Wolfson v. Syracuse Newspapers, Inc.*, 4 N.Y.S.2d 640 (App. Div. 1938)); see also Ernest P. Seelman, The Law of Libel

and Slander § 130, at 120 (1933). Relevant here, *Winrod* cited the test from Seelman as follows:

" 'The test of whether the article is a republication or a repetition should not depend on an interval of time, or a separate sale but upon the answer to the question. *Was the act of the defendant a conscious independent one?* The individual who sends the same letter to different persons at the same or another time, consciously and intentionally and independently does so. Each separate mailing is a separate *conscious* act. Each would then be provable as showing conscious intent. Whereas, in the case of a newspaper, as the circulation is considered one of the chief items of damage, and plaintiff recovers for all the distribution, no *conscious* intent arises until the defendant *consciously* as a second edition republishes the article. In each case it is the *conscious* act which determines.' " (Emphases in original.) *Winrod*, 334 Ill. App. at 70 (quoting Seelman, *supra*, § 130, at 120).

¶ 33    The *Winrod* court concluded that "Seelman's test of the *conscious* act appeals to us as more rational, and in the case of a newspaper or magazine 'no *conscious* intent arises until the defendant *consciously* as a second edition republishes the article.' " (Emphases in original.) *Id.* at 72 (quoting Seelman, *supra*, § 130, at 120). For that reason, the court held that the miscellaneous copies of *Life* magazine received on April 13, 1942, and thereafter did not constitute separate publications giving rise to separate causes of actions with different accrual dates. *Id.* at 61-62, 72. Instead, those copies were held to be subject to the single-publication rule. *Id.* at 72. Accordingly, the plaintiff's cause of action accrued on April 11, 1942, and was time-barred. *Id.* at 60, 72.

¶ 34    In 1959, the Illinois legislature codified the single-publication rule by adopting the Uniform Single Publication Act, which provides in pertinent part:

"No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture." 740 ILCS 165/1 (West 2016).

¶ 35    Ciolino maintains that, consistent with the single-publication rule, he is not attempting to bring multiple lawsuits against Ekl for each time *Murder in the Park* was broadcast but, rather, a single lawsuit. Thus, Ciolino asserts that application of the discovery rule would not run afoul of the single-publication rule.

¶ 36    However, we need not reach the parties' arguments regarding the interplay between the single-publication rule and the discovery rule because the July 15, 2015, screening of *Murder in the Park* in Chicago is a separate publication that does not fall within the ambit of the single-publication rule. The parties discuss *Tom Olesker's* at length, but that case involved a one-time publication of the defamatory credit report by a credit reporting agency to its subscribers, a group of which the plaintiff was not a member. *Tom Olesker's*, 61 Ill. 2d at 131-32. The single-publication rule was not at issue nor discussed. See generally *id.* Accordingly, *Tom Olesker's* has no real bearing on the instant case.

¶ 37    The single-publication rule does not gather under its umbrella all repetitions of allegedly defamatory material appearing in the same medium. See 740 ILCS 165/1 (West 2016) (qualifying that the rule only applies to any "*one*" publication, exhibition, utterance, presentation to an audience, broadcast over radio or television, or "any one exhibition of a motion picture" (emphasis added)); see also *id.* § 3 ("This Act shall be so interpreted as to effectuate its purpose to make uniform the law of those states or jurisdictions which enact it."). Multiple publications[3] of the defamatory material may still exist. See, *e.g.*, *Winrod*, 334 Ill. App. at 70, 72; *Blair*, 369 Ill. App. 3d at 325-26; *Founding Church*, 60 Ill. App. 3d at 588-89; *Shively v. Bozanich*, 80 P.3d 676, 682-85, 685 n.7 (Cal. 2003) (providing a detailed discussion of the single-publication rule); see also *Shively*, 80 P.3d at 685 (observing the "qualification that repetition of the defamatory statement in a *new edition* of a book or newspaper constitutes a new publication of the defamation that may give rise to a new cause of action, with a new accrual date" (emphasis in original)); Restatement (Second) of Torts § 577A (1977) (covering "Single and Multiple Publications").

¶ 38    The single-publication rule certainly applies where defamatory material is mass-published to the public in a medium where the delayed receipt of the

_____

[3]Varying terms are used to identify this situation.

defamatory material is incidental to the medium's mode of distribution. See *Winrod*, 334 Ill. App. at 65 (providing that, "where any distribution takes place after the original sale, no new cause of action will accrue if the subsequent distribution is reasonably connected, by trade practice relating to the type of printed matter involved, to the original distribution"); see, *e.g.*, *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615 (7th Cir. 2013) (noting that the single-publication rule "protects speakers and writers from repeated litigation arising from a single, but mass-produced, defamatory publication"). The clearest example is where the defamatory material is contained in a book or a magazine of nationwide distribution. The publisher will not be subject to a separate suit for each individual who reads the defamatory material following the release of the first edition or particular issue. This is true, as demonstrated by *Winrod*, even where certain copies are delivered after the general public has received the copy of the edition or issue. See generally *Winrod*, 334 Ill. App. 59. As a result, there is only one accrual date.

¶ 39        Section 577A of the Restatement (Second) of Torts, "Single and Multiple Publications," is particularly illuminating. This section provides, in relevant part:

> "(1) Except as stated in Subsections (2) and (3), each of several communications to a third person by the same defamer is a separate publication.
>
> (2) A single communication heard at the same time by two or more third persons is a single publication.
>
> (3) Any one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication." Restatement (Second) of Torts § 577A (1977).

Of note, comment *d* on subsection (3) states in pertinent part:

> "So far as the cases heretofore decided indicate, the single publication rule stated in Subsection (3) *does not include separate aggregate publications on different occasions*. Thus if the same defamatory statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication and there are two causes of action. The same is true of a rebroadcast of the defamation over radio or television *or a second run of a motion picture on the same evening*. In these cases the publication reaches a new group and the

repetition justifies a new cause of action. The justification for this conclusion usually offered is that in these cases *the second publication is intended to and does reach a new group*." (Emphases added.) *Id.* § 577A cmt. d, at 210.

¶ 40   Unlike, for example, an edition of a newspaper or magazine that was, upon its first publication, distributed to the general public, *Murder in the Park* was first screened to a limited audience in New York City on November 14, 2014. This certainly constituted a publication of the allegedly defamatory material, and the premiere itself would be subject to the single-publication rule. *Id.* § 577A cmt. c. (noting that the single-publication rule applies to an "aggregate communication that reaches a large number of persons at the same time"). However, we find that the subsequent screenings of *Murder in the Park* to "sold-out audiences" at the Cleveland International Film Festival and, critically, at the Gene Siskel Film Center in Chicago were separate publications. Each of these screenings was shown to new and distinct audiences at different locations, dates, and times. See *Blair*, 369 Ill. App. 3d at 326 (finding the use of the same photo was not a republication in part because it was targeted at the same audience and locations); *Lehman v. Discovery Communications, Inc.*, 332 F. Supp. 2d 534, 539 (E.D.N.Y. 2004) (holding that, even though the subsequent re-airing of the defamatory broadcast was in a format identical to the original broadcast, the rebroadcast was considered to be a separate publication where it was "intended to reach a new audience"); see also *id.* (commenting that, "[i]f the decision maker has sustained her maximum liability when she first broadcasts the television program, she has no motivation to limit the injury").

¶ 41   We note that, in the cases holding that the publications at issue therein were subject to the single-publication rule, the publications were "mass-published" to a general or national audience. See *Winrod*, 334 Ill. App. at 60 (noting that the issue of *Life* magazine was distributed "throughout the United States"); *Blair*, 369 Ill. App. 3d at 326 (finding that the photo was "delivered to a mass sector of the public"); see, *e.g.*, *Shively*, 80 P.3d at 689 (holding that the single publication rule applied to book that had been "generally distributed to the public"); *Long v. Walt Disney Co.*, 10 Cal. Rptr. 3d 836, 842 (Ct. App. 2004) (explaining that, "like a publication in a nationally distributed book, newspaper, or magazine, the broadcasts on national television over a period of many months meant that plaintiffs had access to them, if only as members of the general public"); see also *Long*, 10

Cal. Rptr. 3d at 841 ("The [single-publication rule] was intended to protect defamation-like claims, implicating First Amendment values and arising from mass communications."); see also Restatement (Second) of Torts § 577A cmt. c, illus. 3, 4 (1977) (illustrations to the comment on subsection (3) provide examples of single publications that involve an article published in a magazine of *national circulation* and a broadcast over television on a *national network*). As mentioned, ours is the reverse situation, where *Murder in the Park*'s premiere occurred in a far more constrained way. It was accessible on November 17, 2014, only in New York City at a certain time and at the DOC NYC film festival. Stated differently, by instead "starting small" and publishing *Murder in the Park* to a limited audience in New York City, it cannot follow that the audiences in Cleveland or Chicago were part of the same audience.

¶ 42 In a similar vein, the subsequent screenings in Cleveland and Chicago are not akin to the situation where, for example, miscellaneous copies of a magazine issue containing defamatory material incidentally make their way into the hands of third parties on a later date. See *Winrod*, 334 Ill. App. at 63-65; see also *Wolfson*, 4 N.Y.S.2d at 642 (determining that defendants' conduct of maintaining bound copies of its prior issues in its library and making such copies available upon request by a third party was "passive in character, with nothing to indicate a conscious intent to induce the public or any individual to read the alleged libels" and thus did not amount to a republication). Had the premiere in New York City been the only time *Murder in the Park* was shown, there would not have been any other incidental disseminations of the documentary. Accordingly, the additional screenings in Cleveland and Chicago cannot be characterized as passive.

¶ 43 We observe also that the single-publication rule would not serve its purpose if it were applied to encompass the subsequent screenings in Cleveland and Chicago. Specifically, application of the rule would not prevent "ungovernable piecemeal liability and [a] potentially endless tolling of the statute of limitations." See, *e.g.*, *Long*, 10 Cal. Rptr. 3d at 841. For example, in *Blair*, 369 Ill. App. 3d at 320-21, the defendants used the same photo of the plaintiff to promote its restaurant in several ways from 1995 until 2004. *Blair* specifically analyzed and rejected the argument that the repeated use of the photo constituted separate publications. *Id.* at 324-25. In doing so, the court noted that "a republication of the plaintiff's likeness can constitute a new cause of action if the publication is altered so as to reach a new

audience or promote a different product." *Id.* at 325. As an example, the court cited *Lehman*, 332 F. Supp. 2d 534, where 17 rebroadcasts of a program that defamed an orthopaedic surgeon were each held to constitute a republication such that the statute of limitations began anew with each broadcast. *Blair*, 369 Ill. App. 3d at 325. The *Blair* court concluded that the continued use of the plaintiff's image was not considered to be a republication because the picture was used to promote a single product, the "image remained constant and was not significantly altered to reach a new audience" and "was displayed predominantly within the casino and to existing casino customers." *Id.* at 326. Only after examining whether the repeated use of the photo constituted a republication did the appellate court consider and reject the plaintiff's argument that the discovery rule should be applied. *Id.*

¶ 44       Critically, in *Blair*, the appellate court cited *Founding Church* for the broad proposition that the single-publication rule provides that " 'any subsequent appearances or distributions of copies of the original publication are of no consequence to the creation or existence of a cause of action.' " *Id.* at 324-25 (quoting *Founding Church*, 60 Ill. App. 3d at 588). A closer examination of *Founding Church* reveals that that court was not referring to *all* subsequent appearances or distributions of an original publication but of a mass-published article. There, the court considered whether three copies of an allegedly defamatory article could constitute a "second edition or new publication." *Founding Church*, 60 Ill. App. 3d at 589. The allegedly defamatory article was "published generally and released in 1968." *Id.* Although the three copies were released several years later in 1975, the court relied on *Winrod* and held that the three copies "were mailed on an isolated basis and were nothing more than miscellaneous copies incidental to the general publication of the article 7 years earlier." *Id.*; see also *id.* at 588 (noting that, "[u]nder the Uniform Single Publication Act, no person is given more than one cause of action for damages for libel founded on any single publication, such as *one edition of a newspaper or magazine*, or *one printing of a book*" (emphases added)). The court commented that it would be unjust and unrealistic to deem the three copies a republication because "the article in question might well be on file in libraries, and so open to the public anyway." *Id.* at 589.

¶ 45       Again, here there were but several distinct and limited screenings of *Murder in the Park*. Once *Murder in the Park* was shown in New York City, there was no

- 15 -

possibility, like in *Founding Church*, that a copy of its contents "might well be on file" and thus "so open to the public anyway." See *id.*

¶ 46    Accordingly, because *Murder in the Park* was republished in Chicago on July 15, 2015, thus retriggering the statute of limitations, Ciolino's complaint is timely filed. As a result, we need not address whether the discovery rule applies to the earlier screenings in New York City and Cleveland. See *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009) ("As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided.").

¶ 47    Because the defamation and false light claims are timely, Ekl's arguments that Ciolino's civil conspiracy claim and IIED claim are time-barred because they are derivative and thus subject to the same one-year statute of limitations fail.

¶ 48    Finally, Ekl asserts that reversal of the appellate court's decision is warranted for the additional reason that it wrongly declined to rule on whether the statements attributed to Ekl were actionable as a matter of law. Like the trial court and the appellate court, we decline to reach these arguments. See 2020 IL App (1st) 190181, ¶¶ 79-86. We make clear that we express no opinion beyond the issue of whether the claims were timely filed.

¶ 49                                CONCLUSION

¶ 50    Because the screenings of *Murder in the Park* each constituted a separate publication of the allegedly defamatory material, the single-publication rule does not apply. Following the screening of *Murder in the Park* in Chicago, Ciolino filed his complaint within the one-year statute of limitations. Because the complaint is timely filed, we need not consider whether the discovery rule would apply to toll the statute of limitations.

¶ 51    Accordingly, the judgment of the appellate court, reinstating Ciolino's claims against Ekl, is affirmed. We remand the cause to the trial court for further proceedings.

¶ 52    Appellate court judgment affirmed.

¶ 53    Circuit court judgment reversed.

¶ 54    Cause remanded.


¶ 55    CHIEF JUSTICE ANNE M. BURKE and JUSTICE MICHAEL J. BURKE took no part in the consideration or decision of this case.