GEORGINE SCHLEICH, APPELLEE, V. ARCHBISHOP BERGAN MERCY HOSPITAL, A NEBRASKA CORPORATION, APPELLANT.

491 N.W.2d 307

Filed October 23, 1992.   No. S-89-1412.

Thomas D. Wulff, of Kennedy, Holland, DeLacy & Svoboda, for appellant.

Richard J. Dinsmore for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

This is an action for negligent infliction of emotional

distress. The case was submitted to the jury, which returned a verdict for the plaintiff, Georgine Schleich, in the amount of $30,000. The defendant, Archbishop Bergan Mercy Hospital, has appealed.

The record shows that on July 26, 1988, Allison Jasperson, the daughter of the plaintiff, was admitted to the defendant hospital for gallbladder surgery. While in the operating room, Allison suffered cardiac arrest and went into a coma. Allison was then placed in the hospital's coronary care unit, where she remained in a coma.

Allison's doctors determined that she was brain dead and would not regain consciousness. Allison's family, including her husband, Larry, and the plaintiff, decided to follow the doctors' advice and placed Allison on "no code" status, which meant that in the event of another heart attack, no action would be taken to assist or revive Allison.

On August 14, 1988, it was decided to remove Allison's endotracheal tube in order to allow her to die with peace and dignity. The tube was to be removed that evening or the next morning, and following its removal, Allison would be transferred from coronary care to a less-intense-care area of the hospital.

At about noon of August 14, Larry and two other men came to the hospital to make a videotape of Allison. After checking the hospital's policy regarding videotaping patients, the shift supervisor, Nurse Sonia Astle, permitted the men to enter Allison's room.

Later that day, about 2:26 p.m., while Larry and the plaintiff were visiting Allison, Nurse Betsy Clark entered Allison's room for the purpose of suctioning Allison's endotracheal tube. Her husband, Larry, insisted that the nurse not suction Allison at that time because a respiratory therapist had just been in to do it. Larry and the plaintiff had the door to Allison's room shut, and the nurse thought this was uncharacteristic because prior to that day Larry and the plaintiff had always left the door open and wanted Allison to have all care necessary to be sure that she was comfortable.

Approximately 4 minutes after Larry and the plaintiff left Allison's room, Allison went into ventricular fibrillation, and

she died shortly after that. When the nurses came into Allison's room, they noticed that her sandals had been placed in the wastebasket and that all of the water in her flowers had been emptied.

Because Allison's condition had been stable prior to her death and because of the unusual circumstances of the afternoon, Nurse Astle felt that it was necessary to have the cause of Allison's death determined. Nurse Astle telephoned one of her supervisors at home and was told to contact Allison's doctors. Nurse Astle then called Dr. Imbrock and related the events of the afternoon. Dr. Imbrock instructed Nurse Astle to notify the county coroner. Nurse Astle then called Kristina Murphree, the acting county coroner.

The hospital's policy regarding notification of the coroner states that the house manager or her designate shall notify the coroner under specified instances. The house manager testified that she did not notify the coroner in this case and that she did not designate Nurse Astle to do it.

After the coroner had been notified, the coroner called the pathologist, who suggested that an autopsy be performed and the police be called so that the incident could be investigated promptly. Accordingly, the coroner contacted the police, who then went to the hospital and interviewed the nurses on duty that afternoon, as well as Larry and the plaintiff.

The plaintiff was briefly interviewed by a police officer. During the interview, the plaintiff was cooperative and never asked that the interview be stopped. The plaintiff was never directly accused of any criminal conduct and was never placed under arrest.

The evidence presented by the plaintiff regarding the emotional distress she suffered consists of the following:

Q. And when you returned, Georgine, what happened when you and Larry returned to the hospital after you visited with the family members?

A. As soon as we entered the emergency section, they right away separated us and put me in one room and said that Allison had died and that we couldn't see her.

Q. And you were separated from Larry?

A. Yes.

Q. And you were taken to a room?

A. Yes.

Q. By whom?

A. By one of the nurses, and we were allowed to use the telephone in the emergency ward anytime we wanted to, so I immediately went and called my son and daughter to come.

Q. Did you think something was wrong?

A. Yes.

Q. Did you find out that the police were there?

A. Yes, and my son came and told me that they were questioning Larry about killing her.

Q. And then did they then come for you?

A. Yes, and then they questioned me.

Q. And did the person identify himself as a policeman?

A. Yes, he did.

Q. What did he ask you?

A. He asked me if I had ever monkeyed with her — any of her machines or anything to cause her death. Of course I said no.

Q. Did he ask you if Larry did?

A. Yes, also if I knew Larry had done anything. I was sure that he hadn't.

Q. Did there come a time that you observed or were told that they were photographing your daughter's body, the crime lab people?

A. I might have, but I was so shook up by being accused of murdering my own child that I hardly knew what was going on.

Q. Were you subsequently allowed to go and see your daughter and have a prayer service in the room for your daughter?

A. Yes, we were. And the priest came but —

Q. . . . Were you allowed to kiss your daughter or touch your daughter?

A. No. We couldn't go near her at all.

Q. Who told you that?

A. The nurse, and they stood guard in the room right beside her.

Q. Georgine, you're obviously bothered today talking about this.

A. Yes. I'm sorry, I wasn't going to breakdown.

Q. We're almost done. How has it been since? I have to ask you how has it been since the time of your daughter's death. I know you of course mourn your daughter's death; is that correct?

A. Well, it's very painful, especially when they accuse you of killing your own child.

Q. What causes you to think of that?

A. Her pictures in the home, anytime anyone talks about it. A day doesn't go by that you don't think about it. It's bad enough having your child die but having them accuse you that you killed them is that much worse.

The plaintiff testified that as a result of the police interview she has suffered emotional distress; however, the plaintiff has not sought professional counseling, and no medical testimony was offered regarding her condition.

The defendant contends that a verdict should have been directed in its favor because the plaintiff failed to establish a prima facie case of negligent infliction of mental distress in that she failed to prove that she suffered severe emotional distress.

" '[A] directed verdict is proper only where reasonable minds cannot differ and can only draw but one conclusion from the evidence, where an issue should be decided as a matter of law.' " *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 298, 436 N.W.2d 151, 159 (1989).

In order to recover, the plaintiff was required to show that a negligent act of the defendant's proximately caused her to suffer severe emotional distress. *Turek v. St. Elizabeth Comm. Health Ctr., ante* p. 467, 488 N.W.2d 567 (1992). See, also, *Molien v. Kaiser Foundation Hospitals*, 27 Cal. 3d 916, 616 P.2d 813, 167 Cal. Rptr. 831 (1980); *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970); *Bass v. Nooney Co.*, 646 S.W.2d 765 (Mo. 1983); *Schultz v. Barberton Glass Co.*, 4 Ohio St. 3d 131, 447 N.E.2d 109 (1983).

The only negligence alleged in the petition was that employees of the defendant hospital informed the homicide division of the Omaha Police Division that the plaintiff or

decedent's husband or both had some part in causing the death of the decedent. The evidence does not support a finding that the allegation made in the petition was true, and the most that the plaintiff proved was that the decedent's death occurred under suspicious circumstances.

The evidence in this case failed to prove negligence on the part of the defendant which caused severe emotional distress to the plaintiff. The fact that the coroner was notified by Nurse Astle instead of the house manager, as the policy of the defendant hospital required, is of no legal significance. There is no evidence in this case of any violation of a standard of care which was an accepted standard of care in the industry.

In this case the death of the patient, Allison Jasperson, occurred under suspicious circumstances. Nurse Astle, who was the supervisor of the coronary care unit of the hospital and who was on duty when Allison died, first contacted one of her supervisors, who instructed her to contact the patient's attending physician. The physician then instructed Nurse Astle to notify the coroner. What happened after that was at the direction of the coroner and the police. It might well have been negligent for the hospital to do nothing under the circumstances of this case. As the defendant points out, there is a qualified privilege for any citizen to report facts to the proper governmental authorities. *Johnson v. First Nat. Bank & Trust Co.*, 207 Neb. 521, 300 N.W.2d 10 (1980). In this case, the hospital employees merely notified the coroner of the unusual circumstances, and the coroner in turn notified the police, who determined what kind and extent of an investigation should be made. Under such circumstances there is no liability upon the persons who provide the information to the proper authorities. See *Edgar v. Omaha Public Power Dist.*, 166 Neb. 452, 89 N.W.2d 238 (1958).

In this case, there was also no evidence that the plaintiff suffered severe emotional distress.

To be actionable, emotional distress must have been so severe that no reasonable person could have been expected to endure it. *Hassing v. Wortman*, 214 Neb. 154, 333 N.W.2d 765 (1983); *Gall v. Great Western Sugar Co.*, 219 Neb. 354, 363 N.W.2d 373 (1985); *Davis v. Texaco, Inc.*, 210 Neb. 67, 313 N.W.2d 221

(1981). Furthermore, the emotional anguish or mental harm must be medically diagnosable and must be of sufficient severity that it is medically significant. *Turek, supra*, citing *Bass v. Nooney Co., supra.*

Here, the plaintiff as a matter of law failed to prove that she had suffered severe emotional distress, as it has been defined by this court and other jurisdictions, for which recovery may be had.

It is unnecessary to consider the other assignments of error.

The judgment is reversed and the cause remanded with directions to dismiss the petition.

REVERSED AND REMANDED WITH DIRECTIONS.