Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/26/2024 09:06 AM CDT

Andrew J. Syring, appellant, v.
The Archdiocese of Omaha, appellee.

___ N.W.3d ___

Filed July 26, 2024.    No. S-23-417.

1. **Summary Judgment: Appeal and Error.** An appellate court reviews a district court's grant of summary judgment de novo.
2. **Motions to Dismiss: Appeal and Error.** A district court's grant of a motion to dismiss is reviewed de novo.
3. **Appeal and Error.** In a de novo review, an appellate court reaches a conclusion independent of the trial court.
4. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.
5. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.
6. **Limitations of Actions.** If the facts in a case are undisputed, the issue as to when the statute of limitations begins to run is a question of law.
7. **Statutes.** Statutory interpretation presents a question of law.
8. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
9. **Limitations of Actions: Libel and Slander.** The limitations period in Neb. Rev. Stat. § 25-208 (Reissue 2016) commences upon the publication of the defamatory matter which forms the basis of the action.
10. **Actions: Libel and Slander: Time: Damages.** Under Nebraska's single publication rule, there is just one cause of action for tort damages founded upon a single publication, and that cause of action accrues at the moment of the initial publication.

11. **Libel and Slander.** Nebraska's single publication rule, as codified in Neb. Rev. Stat. § 20-209 (Reissue 2022), applies to internet postings and publications.

12. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

13. **Statutes.** It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.

14. **Libel and Slander: Words and Phrases.** There is an implicit distinction in Neb. Rev. Stat. § 20-209 (Reissue 2022) between single and separate publications.

15. **Libel and Slander.** Under Neb. Rev. Stat. § 20-209 (Reissue 2022), a subsequent issue, presentation, broadcast, or exhibition, communicating the same defamatory statement, is a separate publication giving rise to a separate cause of action.

16. ____. Generally, the single publication rule does not include separate aggregate publications on different occasions.

17. **Libel and Slander: Liability.** One who repeats or otherwise republishes defamatory matter is subject to liability as if he or she originally published it.

18. **Actions: Mental Distress: Proof.** To recover for intentional infliction of emotional distress, a plaintiff must prove (1) intentional or reckless conduct (2) that was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it.

19. **Mental Distress.** Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of the particular case. The facts must be such that when heard, an average member of the community would resent the actor and exclaim "Outrageous!" Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities that result from living in society do not rise to the level of extreme and outrageous conduct.

20. **Judgments: Appeal and Error.** An appellate court may affirm a lower court's ruling that reaches the correct result, albeit based on different reasoning.

21. **Motions to Dismiss: Pleadings: Appeal and Error.** When reviewing an order dismissing a complaint, the appellate court accepts as true all facts which are well pled and the proper and reasonable inferences

of law and fact which may be drawn therefrom, but not the plaintiff's conclusion.

22. **Employer and Employee.** The ministerial exception prevents the courts from interfering with the employment relationship between a religious institution and its ministers.

Appeal from the District Court for Cuming County, Mark A. Johnson, Judge. Affirmed.

Lyle Joseph Koenig, of Koenig Law Firm, and James R. Welsh, of Welsh & Welsch, P.C., L.L.O., for appellant.

William N. Beerman and Patrick M. Flood, of Pansing, Hogan, Ernst & Buser, L.L.P., for appellee.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

A Catholic priest appeals from a judgment in favor of his former employer dismissing his claims, which stemmed from a list published on a website that named church personnel against whom there had been "substantiated claims of clergy sexual abuse of or sexual misconduct with a minor" and from a telephone conversation regarding his potential service as a chaplain. One novel issue is whether that conversation was a republication of the list. It was not. Another novel issue is whether the ministerial exception shields the church from liability regarding the telephone conversation. It does. We therefore affirm.

## II. BACKGROUND

Andrew J. Syring is a Catholic priest who actively served the Archdiocese of Omaha (Archdiocese) from 2011 to 2018. Syring's allegations in this case were largely premised on three events: the Archdiocese's initial publication of the list on November 30, 2018; an update to the list in 2020; and a subsequent telephone conversation between a church official

and a chief executive officer of a hospital operated and controlled by a Catholic religious order regarding Syring's fitness to serve as a chaplain.

We begin by setting forth, in broad strokes, an overview of this case with a focus on the procedural history. We will provide additional background later in the opinion.

## 1. Syring's Complaint

On October 19, 2020, Syring sued the Archdiocese. He later filed amended complaints, alleging that the Archdiocese was liable for "Defamation," "Tortious Interference With Prospective Employment Opportunity and Defamation," "Slander-Per Se," "Breach of Fiduciary Duty," "Intentional Infliction of Emotional Distress," and other claims. He sought damages, attorney fees, and costs.

The Archdiocese filed answers and affirmative defenses, which are not at issue. The answers alleged, in part, that Syring's claims were barred by (1) the applicable statute of limitations, (2) a lack of subject matter jurisdiction under the ecclesiastical abstention doctrine and the ministerial exception, and (3) a failure to allege sufficient facts entitling him to relief. The Archdiocese made similar arguments in dispositive motions, which ultimately led to the dismissal of all claims.

## 2. Archdiocese's Dispositive Motions and District Court's Rulings

In this section, we summarize the Archdiocese's dispositive motions and the district court's rulings to the extent necessary to address the assignments of error on appeal.

### (a) Motion for Summary Judgment on First Amended Complaint

First, the Archdiocese moved for summary judgment on all claims set forth in Syring's first amended complaint. The district court's journal entry and a written order indicated that it held a hearing on the motion and received evidence from the Archdiocese only, without objection from Syring.

As relevant here, the district court agreed with the Archdiocese that Syring's "Defamation" claim was barred by Nebraska's 1-year statute of limitations[1] and thus granted summary judgment on that claim. It found that the evidence was undisputed that the list was initially published on November 30, 2018, and that Syring filed the action more than 1 year later, on October 19, 2020. The court rejected Syring's argument that new limitations periods were triggered by "republications" of the list in 2020.

Syring later moved for leave to file a second amended complaint, which the district court granted.

### (b) Motion to Dismiss Certain Claims in Second Amended Complaint

Next, the Archdiocese moved to dismiss certain claims in Syring's second amended complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief could be granted. The district court's written order stated that it held a hearing, during which it took judicial notice of the second amended complaint and its previous order on summary judgment. There is no indication in the order that the court received evidence.

The Archdiocese argued that Syring's claims for "Tortious Interference With Prospective Employment Opportunity and Defamation," "Slander-Per Se," and "Breach of Fiduciary Duty" were constitutionally barred, because they "implicate[d] religious doctrine and church personnel decisions." Relying on U.S. Supreme Court jurisprudence, the court agreed and sustained the motion to dismiss as to those claims.

### (c) Motion for Summary Judgment on Remaining Claims

Finally, the Archdiocese moved for summary judgment on the remaining causes of action—two claims for intentional infliction of emotional distress. The district court's order

---

[1] Neb. Rev. Stat. § 25-208 (Reissue 2016).

stated that it held a hearing on the motion for summary judgment. The order suggests that the court received as evidence the first and second amended complaints, affidavits regarding the telephone conversation, and transcripts of the depositions of the archbishop of the Archdiocese and Syring, with accompanying exhibits.

The district court granted the motion for summary judgment, reasoning that Syring had "failed to demonstrate any medical opinion to establish the cause and extent of any alleged emotional distress." In particular, it highlighted an excerpt from Syring's deposition, in which Syring testified that he had not sought out any medical care or treatment, or any other form of care, regarding his alleged injuries. Having concluded that Syring failed to meet his burden to show a genuine issue of material fact existed, the court declined to address the Archdiocese's alternative theories for dismissal.

Syring filed a motion to alter or amend the order, which the district court overruled. He then filed a timely appeal, which we moved to our docket.[2]

## III. ASSIGNMENTS OF ERROR

Syring assigns, restated, consolidated, and reordered, that the district court erred in (1) dismissing his libel claims on the ground that the statute of limitations had run; (2) dismissing his intentional infliction of emotional distress claims for lack of a medical causation opinion; and (3) dismissing his claims for "Tortious Interference With Prospective Employment Opportunity and Defamation," "Slander-Per Se," and "Breach of Fiduciary Duty" based upon the "ecclesiastical abstention doctrine."

## IV. STANDARD OF REVIEW

[1-3] An appellate court reviews a district court's grant of summary judgment de novo.[3] Likewise, a district court's grant

---

[2] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2022).

[3] *Puncochar v. Rudolf*, 315 Neb. 650, 999 N.W.2d 127 (2024).

of a motion to dismiss is reviewed de novo.[4] In a de novo review, an appellate court reaches a conclusion independent of the trial court.[5] Additional standards of review will be set forth in the analysis.

## V. ANALYSIS

We first discuss Syring's assignments of error pertaining to summary judgment and then those pertaining to the motion to dismiss.

### 1. Assigned Errors Relating to Summary Judgment

Syring contends that the district court erred in entering summary judgment for the Archdiocese on his libel and intentional infliction of emotional distress claims.

### (a) Standard of Review

[4,5] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[6] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.[7]

[6-8] If the facts in a case are undisputed, the issue as to when the statute of limitations begins to run is a question of law.[8] Likewise, statutory interpretation presents a question

---

[4] *Williams v. Frakes*, 315 Neb. 379, 996 N.W.2d 498 (2023).

[5] *In re Guardianship of Patrick W.*, 316 Neb. 381, 4 N.W.3d 833 (2024).

[6] *In re Eileen Ryan Revocable Trust*, 316 Neb. 524, 5 N.W.3d 442 (2024).

[7] *Id.*

[8] *Timothy L. Ashford, PC LLO v. Roses*, 313 Neb. 302, 984 N.W.2d 596 (2023).

of law.[9] An appellate court independently reviews questions of law decided by a lower court.[10]

### (b) Additional Facts

The following facts appear to be undisputed. On November 30, 2018, the Archdiocese published on its website a "List of Substantiated Claims of Clergy Sexual Abuse of or Sexual Misconduct with a Minor" stemming from a review of church personnel files from 1978 to 2018. The goals of the publication were to provide victim outreach and transparency. Syring's name appeared on the list. The same day, the Archdiocese published a press release with a reference to its website. The press release was sent to media outlets, including a newspaper that published its own article using information gleaned from the Archdiocese's website and the list. The Archdiocese also published the list in an Archdiocesan-operated newspaper, and it submitted the personnel records of those on the list to the Attorney General.

The list was updated quarterly by the Archdiocese, if necessary. On October 2, 2020, the Archdiocese updated the list by adding one or more names to it. There were no changes pertaining to Syring.

On October 6, 2020, Scott Hastings, the vicar for clergy and judicial vicar for the Archdiocese, spoke over the telephone with Tyler Toline, the chief executive officer of the hospital. Toline asked whether the Archdiocese would approve of Syring's serving as a chaplain at the hospital. Hastings responded that Syring was still a priest but was not a priest in "good standing." Further, Hastings told Toline that the Archdiocese would not trust or assign Syring to the position because it would "involve a reasonable possibility of interaction with minors" and referred Toline to the list. Hastings

---

[9] *Fountain II v. Douglas Cty. Bd. of Equal.*, 315 Neb. 633, 999 N.W.2d 135 (2024).

[10] *In re Hessler Living Trust*, 316 Neb. 600, 5 N.W.3d 723 (2024).

stated that he "could not direct [the hospital] on what to do, but the Archdiocese would not give any permission for . . . Syring to serve in this capacity and would forbid . . . Syring from being a [c]haplain there." Toline did not communicate directly with Syring about the position, and Syring never applied for it.

Syring did not, at any point, receive medical care or treatment for the alleged emotional distress caused by the Archdiocese's conduct.

### (c) Resolution

### *(i) Libel Claims*

#### a. Parties' Arguments

[9] Syring argues that the district court erred in finding his libel claims were barred by the 1-year limitations period in § 25-208. Our cases hold that the limitations period in § 25-208 commences upon the publication of the defamatory matter which forms the basis of the action.[11]

Syring does not dispute that the Archdiocese originally posted the list on its website in November 2018. Nor does he disagree that this action was commenced more than 1 year later, in October 2020.

Instead, Syring argues there were two "republications" that triggered new limitations periods: first, the Archdiocese's update to the list on October 2, 2020, and second, Hastings' reference to the list during the telephone conversation with Toline on October 6. The Archdiocese relies upon Nebraska's single publication rule[12] and disputes that there was a "republication." We agree with the Archdiocese.

#### b. Single Publication Rule Applies

[10] In actions for libel or slander, Nebraska applies a single publication rule. Section 20-209 provides:

---

[11] *Timothy L. Ashford, PC LLO v. Roses, supra* note 8.

[12] Neb. Rev. Stat. § 20-209 (Reissue 2022).

No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication, exhibition, or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

We have said that under Nebraska's single publication rule, there is just one cause of action for tort damages founded upon a single publication, and that cause of action accrues at the moment of the initial publication.[13]

[11] In *Timothy L. Ashford, PC LLO v. Roses*,[14] we recently held that Nebraska's single publication rule, as codified in § 20-209, applies to internet postings and publications. There, an attorney filed suits alleging that he and his law firm were defamed by a negative review posted on the law firm's Google business page.[15] The attorney argued that the unfavorable Google review should be treated as a "'continuing tort,'" with a new limitations period accruing each day the review remained posted on the internet.[16] In rejecting that argument, we concluded the unfavorable Google review was a single publication under § 20-209 and, thus, the attorney had a single cause of action that accrued on the date when the Google review was first posted. Because the attorney failed to file his defamation action within 1 year of that date, it was time barred.

Our decision in *Roses* was released after the district court entered its order disposing of Syring's libel claims but before

---

[13] *Timothy L. Ashford, PC LLO v. Roses, supra* note 8.

[14] *Id.*

[15] See *id.*

[16] *Id.* at 322, 984 N.W.2d at 612.

Syring filed the instant appeal. Syring does not dispute that *Roses* applies here.

On this record, we conclude that the list posted on the Archdiocese's website on November 30, 2018, was a single publication under § 20-209, regardless of how many days Syring's name remained on the list. Thus, Syring could not allege "more than one cause of action for damages for libel or slander or invasion of privacy or any other tort"[17] founded upon that single publication. Because Syring failed to file this action within 1 year of the initial publication, any claim founded upon it is time barred. The question becomes whether Syring could allege additional causes of action founded upon "republications."

### c. Alleged Republications

This case presents our first opportunity to consider the application of Nebraska's single publication rule where a defendant purportedly republished defamatory matter previously published on its website.

[12,13] Familiar principles of statutory interpretation guide our analysis. Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[18] It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.[19]

[14,15] Section 20-209 does not explicitly refer to "republications," but there is an implicit distinction in the statute between "single" and separate publications. Section 20-209 applies as a bar to multiple suits founded on any "single

---

[17] § 20-209.

[18] *In re Change of Name of Druckenmiller*, 316 Neb. 807, 7 N.W.3d 199 (2024).

[19] *Saint James Apt. Partners v. Universal Surety Co.*, 316 Neb. 419, 5 N.W.3d 179 (2024).

publication," including, but not limited to, "any *one issue* of a newspaper or book or magazine," "any *one presentation* to an audience," "any *one broadcast* over radio or television," and "any *one exhibition* of a motion picture." (Emphasis supplied.) It follows that under § 20-209, a *subsequent* issue, presentation, broadcast, or exhibition, communicating the same defamatory statement, is a separate publication giving rise to a separate cause of action.

[16] The Restatement (Second) of Torts elaborates on the distinction. It states that, generally, the single publication rule does not include "separate aggregate publications on different occasions."[20] For example, "if the same defamatory statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication and there are two causes of action."[21] In that situation, "the publication reaches a new group and the repetition justifies a new cause of action."[22] According to the Restatement, the most common justification for this conclusion is that "the second publication is intended to and does reach a new group."[23]

Syring points to two instances of purported republications. The first one was the addition of one or more other names to the list. The second was the reference made to the list during the telephone conversation.

Regarding the first instance involving the Archdiocese's update to its website, New York's high court considered the application of the single publication rule in a similar

---

[20] Restatement (Second) of Torts § 577A, comment *d*. at 210 (1977).

[21] *Id.*

[22] *Id.*

[23] *Id.* See, e.g., *Nunes v. Lizza*, 12 F.4th 890 (8th Cir. 2021); *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137 (5th Cir. 2007); *Cusano v. Klein*, 264 F.3d 936 (9th Cir. 2001); *Clark v. Viacom Intern. Inc.*, 617 Fed. Appx. 495 (6th Cir. 2015); *Ciolino v. Simon*, 2021 IL 126024, 455 Ill. Dec. 750, 192 N.E.3d 579 (2021); *Firth v. State*, 98 N.Y.2d 365, 775 N.E.2d 463, 747 N.Y.S.2d 69 (2002).

situation.[24] There, the court held as a matter of law that an unrelated modification to the defendant's website did not constitute a republication of allegedly defamatory matter previously published on the same website. The court explained:

> The mere addition of unrelated information to a Web site cannot be equated with the repetition of defamatory matter in a separately published edition of a book or newspaper . . . . The justification for the republication exception has no application at all to the addition of unrelated material on a Web site, for it is not reasonably inferable that the addition was made either with the intent or the result of communicating the earlier and separate defamatory information to a new audience.[25]

Other courts have reached a similar conclusion.[26]

We agree with the New York court's reasoning and conclude Syring has failed to show that the Archdiocese's addition of one or more other names to the list was intended to and did reach a new audience. The list constituted one continuous presentation of the online publication to a global audience. On these facts, we cannot conclude there was a separate publication triggering a new limitations period for Syring's libel claims.

[17] We also reject Syring's argument that Hastings' reference to the list during the telephone conversation was a republication. We have previously recognized that one who repeats or otherwise republishes defamatory matter is subject to liability as if he or she originally published it.[27] But courts have held that merely "linking to previously published

---

[24] See *Firth v. State, supra* note 23.

[25] *Id.* at 371, 775 N.E.2d at 466, 747 N.Y.S.2d at 72.

[26] See, e.g., *Kiebala v. Boris*, 928 F.3d 680 (7th Cir. 2019); *Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012); *Atkinson v. McLaughlin*, 462 F. Supp. 2d 1038 (D.N.D. 2006); *Clark v. Viacom Intern. Inc., supra* note 23.

[27] *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990).

material"[28] or a "mere reference to an article,"[29] without more, is not a republication of the original defamatory statement. Here, Hastings' mere reference to the list did not repeat or otherwise "republish" its substantive content.

The pleadings and admitted evidence show there is no genuine issue as to any material facts. Thus, the district court did not err in entering summary judgment for the Archdiocese on the libel claims.

### (ii) Intentional Infliction of Emotional Distress Claims

#### a. Parties' Arguments

Syring argues the district court erred in concluding that his intentional infliction of emotional distress claims failed for lack of a medical causation opinion. The Archdiocese contends that the court appropriately applied the law to these facts. It also argues that Syring's claims fail on alternative grounds, including a lack of extreme and outrageous conduct.

#### b. Elements

[18] To recover for intentional infliction of emotional distress, a plaintiff must prove (1) intentional or reckless conduct (2) that was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community and (3) that the conduct caused emotional distress so severe that no reasonable person should be

---

[28] *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012) (listing cases). See, also, *Lokhova v. Halper*, 995 F.3d 134 (4th Cir. 2021); *Penrose Hill, Ltd. v. Mabray*, 479 F. Supp. 3d 840 (N.D. Cal. 2020); *U.S. ex rel. Klein v. Omeros Corp.*, 897 F. Supp. 2d 1058 (W.D. Wash. 2012).

[29] *In re Philadelphia Newspapers, LLC, supra* note 28, 690 F.3d at 175. See, also, *Penrose Hill, Ltd. v. Mabray, supra* note 28; *U.S. ex rel. Klein v. Omeros Corp., supra* note 28; *Salyer v. Southern Poverty Law Center, Inc.*, 701 F. Supp. 2d 912 (W.D. Ky. 2009).

expected to endure it.[30] In this instance, we need not address all of these elements because our decision on the second one resolves Syring's claims.

### c. No Extreme and Outrageous Conduct

[19] We recall the standard for extreme and outrageous conduct. Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of the particular case. The facts must be such that when heard, an average member of the community would resent the actor and exclaim "Outrageous!" Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities that result from living in society do not rise to the level of extreme and outrageous conduct.[31]

We have said that "it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery or whether it is necessarily so."[32] "Only if reasonable minds may differ does the fact finder then determine whether the conduct in a particular case is sufficiently extreme and outrageous as to result in liability."[33]

Our prior cases illustrate the high bar that a plaintiff must reach. In one case,[34] we found actionable extreme and outrageous conduct where the plaintiff's uncle had sexually abused her on numerous occasions when she was a child, threatening her in order to secure her silence; the uncle again reached out to her, 30 years later, by telephone and repeated the same threats; and then the uncle sent her multiple letters

---

[30] *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419 (2006).

[31] *Id.*

[32] *Brandon v. County of Richardson*, 261 Neb. 636, 657, 624 N.W.2d 604, 621 (2001).

[33] *Id.*

[34] See *Roth v. Wiese, supra* note 30.

and offensive messages. In another case,[35] we determined as a matter of law that a sheriff's use of crude and dehumanizing language when interviewing a victim of a sexual assault was actionable extreme and outrageous conduct. Further, we found actionable conduct when a person who had left a seriously injured passenger to die following a motor vehicle accident called the passenger's mother and falsely reported to her that her daughter had stolen his vehicle.[36]

Viewing the evidence in the light most favorable to Syring, and giving him the benefit of all reasonable inferences deducible from the evidence, we conclude that the Archdiocese was entitled to judgment as a matter of law on Syring's intentional infliction of emotional distress claims. This situation revolving around the list and the telephone conversation simply does not meet the "high hurdle for establishing outrageous conduct."[37]

[20] An appellate court may affirm a lower court's ruling that reaches the correct result, albeit based on different reasoning.[38] Addressing the district court's reasoning based on the third element, Syring contends that the court improperly relied upon cases[39] involving negligent, rather than intentional, infliction of emotional distress. His argument suggests that this court can infer severe emotional distress from the extreme and outrageous conduct and thus there was no need for medical opinion testimony. Having concluded that Syring's claims failed on the second element, we need not address whether the district court applied an incorrect standard to the third element.

---

[35] See *Brandon v. County of Richardson, supra* note 32.

[36] See *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993).

[37] *Heitzman v. Thompson*, 270 Neb. 600, 605, 705 N.W.2d 426, 431 (2005).

[38] *White v. White*, 316 Neb. 616, 6 N.W.3d 204 (2024).

[39] See, *Sell v. Mary Lanning Memorial Hosp.*, 243 Neb. 266, 498 N.W.2d 522 (1993); *Schleich v. Archbishop Bergan Mercy Hosp.*, 241 Neb. 765, 491 N.W.2d 307 (1992).

## 2. ASSIGNED ERRORS RELATING
### TO MOTION TO DISMISS

Syring contends that the district court erred in partially sustaining the motion to dismiss on the ground that certain claims were barred by the "ecclesiastical abstention doctrine." The doctrine to which he refers is rooted in the U.S. Supreme Court's jurisprudence. We provide an overview of it before addressing Syring's specific arguments.

### (a) Standard of Review

[21] When reviewing an order dismissing a complaint, the appellate court accepts as true all facts which are well pled and the proper and reasonable inferences of law and fact which may be drawn therefrom, but not the plaintiff's conclusion.[40]

### (b) Overview of U.S. Supreme Court Jurisprudence

The refusal of courts to become involved in internal church disputes is firmly entrenched in the U.S. Supreme Court's jurisprudence. Historically, the Court has applied an abstention doctrine where the subject matter of a dispute is "strictly and purely ecclesiastical in its character"—for example, matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them."[41] For more than a century, the Court has adhered to the following rule:

> [W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest . . . church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.[42]

---

[40] *MacFarlane v. Sarpy Cty. Sch. Dist. 77-0037*, 316 Neb. 705, 6 N.W.3d 527 (2024).

[41] *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733, 20 L. Ed. 666 (1871).

[42] *Id.*, 80 U.S. (13 Wall.) at 727.

Although the case first articulating this rule[43] was decided before the First Amendment was incorporated against the states,[44] its analysis has been invoked in subsequent First Amendment decisions.[45] The Court has since articulated:

> For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.[46]

In light of these principles, the Court has abstained from resolving disputes over church property,[47] the qualifications of a chaplain,[48] and the defrocking and removal of a bishop.[49] It has also rejected the notion that a state legislature, by statute, may attempt to decide such controversies.[50]

---

[43] See *id.*

[44] See, *Everson v. Board of Education*, 330 U.S. 1, 67 S. Ct. 504, 91 L. Ed. 711 (1947) (guarantee against establishment of religion); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940) (free exercise of religion); *Hamilton v. Regents*, 293 U.S. 245, 55 S. Ct. 197, 79 L. Ed. 343 (1934) (same).

[45] See *Presbyterian Church v. Hull Church*, 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969) (discussing cases).

[46] *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976).

[47] See, *Jones v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979); *Md. & Va. Churches v. Sharpsburg Ch.*, 396 U.S. 367, 90 S. Ct. 499, 24 L. Ed. 2d 582 (1970); *Presbyterian Church v. Hull Church, supra* note 45; *Watson v. Jones, supra* note 41.

[48] See *Gonzalez v. Archbishop*, 280 U.S. 1, 50 S. Ct. 5, 74 L. Ed. 131 (1929), *abrogated on other grounds, Serbian Orthodox Diocese v. Milivojevich, supra* note 46.

[49] See *Serbian Orthodox Diocese v. Milivojevich, supra* note 46.

[50] See *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952).

[22] The lower courts built upon the Court's abstention doctrine to develop the "'ministerial exception.'"[51] Generally speaking, the ministerial exception prevents the courts from interfering with "the employment relationship between a religious institution and its ministers."[52]

In *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,[53] the Court explicitly adopted the ministerial exception and held that it barred an employment discrimination suit brought on behalf of a minister to challenge her church's decision to fire her. The Court reasoned, in pertinent part:

> The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.[54]

The Court has since adhered to these principles.[55]

---

[51] See *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 188, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012) (listing federal circuit courts of appeals cases).

[52] *Id.*

[53] *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC, supra* note 51.

[54] *Id.*, 565 U.S. at 188-89.

[55] See *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 140 S. Ct. 2049, 207 L. Ed. 2d 870 (2020).

### (c) Additional Facts

Because the relevant claims were disposed of on a motion to dismiss, the factual record is limited to the allegations set forth in Syring's second amended complaint. We recite the allegations.

On October 30, 2018, Syring was "abruptly removed from public ministry" and "effectively compelled to resign." At that time, the archbishop of the Archdiocese told Syring that "his ministry had been 'above reproach' and that there were no complaints against him, but that the Archdiocese's standard for public ministry had changed and therefore he was being removed from public ministry by the Archdiocese effective immediately." Because Syring "owed the [a]rchbishop a duty of obedience and the [a]rchbishop was prohibiting [Syring] from serving publicly as a priest going forward, [Syring] had no meaningful choice but to resign his position." The complaint further alleged:

A Roman Catholic [b]ishop, in his diocese, is like a king or ruler as to any matter pertaining to Catholicism. His word is law. Every priest in his diocese owes a duty of obedience to him; the priest's faculties to minister come from the bishop. A priest is unable to serve in any capacity within the Church without faculties from his bishop. As a consequence, when [the] [a]rchbishop . . . removed [Syring] from public ministry, thereby also removing his faculties to minister, it amounted to a constructive dismissal - not just within the Archdiocese . . . , but within the universal Church.

Syring's complaint then set forth allegations regarding the list. It described the events in 2018, including the original publication of the list on the Archdiocese's website, the press release, the article in the Archdiocesan-operated newspaper, and the submission of the list to the Attorney General. It also described the update to the list in 2020. There were no allegations regarding Hastings' specific reference to the list

in 2020, though the complaint did describe the circumstances surrounding the telephone conversation:

> In latter September or early October of 2020, the [c]haplain at [the hospital] resigned. On October 6, . . . Toline the [c]hief [e]xecutive [o]fficer at [the hospital] called the Archdiocese to inquire whether [Syring] could serve as [c]hapl[a]in [there]. On that same day, . . . Hastings, on behalf of [the Archdiocese], stated that the Archdiocese would not give any permission for . . . Syring to serve as a chaplain at [the hospital] because of the reasonable possibility of his interaction with minors.

The complaint stated that an "allegation" was made against Syring in 2013 while he was serving as an associate pastor, though Syring denied any wrongdoing. Pursuant to the Archdiocese's "standard procedure," the allegation was thoroughly investigated by law enforcement and a retired federal agent, and "no wrongdoing was identified." Nonetheless, Syring was evaluated at two treatment facilities, where it was determined that Syring had a "'normal' profile" and that he was "not a pedophile, he was not antisocial, he was not predatory, he did not have a sexual disorder, he was not a homosexual, he was not a narcissist and he was not an exploiter." It was further determined that there was "no indication that [Syring] would want to hurt anyone." Thereafter, the Archdiocese found Syring fit to serve in public ministry, and he returned to service. Syring served in public ministry for over 4 years "without incident" until he was "suddenly removed by [the] [a]rchbishop" in 2018.

Finally, the complaint alleged that Syring had two graduate degrees and training in teaching and counseling, but he could not obtain "full-time, regular employment" in those professions because of the Archdiocese's "false publication."

### (d) Resolution

Syring challenges the district court's application of the U.S. Supreme Court's jurisprudence to dismiss his claims

for "Tortious Interference With Prospective Employment Opportunity and Defamation," "Slander-Per Se," and "Breach of Fiduciary Duty." We see no error in the court's dismissal.

The first two claims were premised solely upon the telephone conversation regarding Syring's ability to serve as a chaplain at the hospital. Syring's claims asserted that the Archdiocese "falsely impute[d] unfitness to preform [sic] duties of employment, and prejudice[d] [Syring] in his profession or trade." The other claims were premised upon Syring's assertion that the Archdiocese owed him fiduciary duties. For example, the complaint identified a purported breach of a fiduciary duty in the Archdiocese's "requiring [Syring's] resignation, and omitting to advise him of his right to counsel, both civil and canonical."

We cannot uphold Syring's claims without interfering with the internal governance of the church, or depriving the church of control, over the selection of its ministers. The claims—based on the conversation between officials of a Catholic archdiocese and a hospital operated by a Catholic religious order regarding permission for Syring to serve as a chaplain, Syring's fitness to perform the duties of his employment, and the requiring of Syring's resignation from that employment—lie at the heart of the ministerial exception articulated by the U.S. Supreme Court. The district court did not err in dismissing these claims.

## VI. CONCLUSION

The district court correctly granted summary judgment for the Archdiocese on Syring's claims for libel and intentional infliction of emotional distress. We likewise see no error in the dismissal of his remaining claims pursuant to the ministerial exception. We therefore affirm the judgment dismissing all claims.

AFFIRMED.

MILLER-LERMAN, J., participating on briefs.